[Cite as *State v. Seeds*, 2017-Ohio-9069.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 16 MA 0055 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ANNETTE SEEDS | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 2014 CR 585

JUDGMENT:     Affirmed.

APPEARANCES:

For Plaintiff-Appellee:     Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio  44503

For Defendant-Appellant:     Atty. Jennifer J. Ciccone
The Ciccone Law Firm, LLC
P.O. Box 207
758 N. 15th Street
Sebring, Ohio  44672

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Carol Ann Robb

Dated:  December 15, 2017

WAITE, J.

**{¶1}** Appellant Annette Seeds appeals an April 7, 2016 Mahoning County Common Pleas Court decision finding her guilty of grand theft. Appellant argues that her convictions are supported by insufficient evidence and are against the manifest weight of the evidence. Appellant also argues that she received ineffective assistance of counsel. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

**{¶2}** From 2010 to 2013, Appellant served in various leadership roles within the Jackson Milton Parent Teacher Association ("PTA"), including president, treasurer, and secretary. The theft charges at issue stem from Appellant's unauthorized use of PTA funds from January 1, 2011 until October 22, 2013. During this time, Appellant served as both treasurer and president of the PTA.

**{¶3}** At trial, the state produced bank statements from the PTA's Huntington Bank account showing that Appellant used PTA funds to purchase approximately $320 in fuel, used $261.32 to pay for meals at various restaurants, had $3,050 in cash back withdrawals and $6,017.50 in ATM withdrawals. According to the state, these purchases were not authorized by the PTA board of directors ("the board").

**{¶4}** According to two former PTA treasurers who served during Appellant's presidency, Appellant refused to provide them with bank statements and financial records, and refused to add them as authorized users on the bank account. At some point, Elaine Akers, a former PTA treasurer, obtained partial bank records from Appellant. Akers became concerned about the account and contacted the Ohio PTA

for guidance. Based on the Ohio PTA's advice, Akers formed a new PTA with newly elected officers. The newly elected officers included Sheila Factor, Cari Delgado, Jennifer Koontz, and Brandy Hinkle.

{¶5} Sometime thereafter, Huntington Bank gave Factor access to the PTA's online account and she obtained complete bank records. After determining that a large number of transactions were unauthorized, she and the other board members spoke to the Jackson Milton School Resource Officer, who contacted Detective Pat Mondora of the Mahoning County Sheriff's Office. Det. Mondora began an investigation and referred the case to Leo Fernandez, a forensic accountant with the Ohio Bureau of Criminal Investigations ("BCI"). Fernandez confirmed that Appellant had made thousands of dollars worth of apparently unauthorized transactions.

{¶6} On June 19, 2014, Appellant was indicted on one count of grand theft, a felony of the fourth degree in violation of R.C. 2913.02(A)(2), (B)(1)(2). At trial, the state alleged that Appellant stole $9,648.89 from the PTA. While the bank records revealed other suspicious transactions, the charges pertained only to the fuel purchases, restaurant visits, and ATM and cash back withdrawals.

{¶7} On January 29, 2016, a jury found Appellant guilty of the sole count of grand theft. On April 7, 2016, the trial court sentenced Appellant to seventeen months of incarceration, all of which was suspended. The trial court also sentenced her to three years of community control and imposed several conditions. The court additionally ordered her to pay restitution to the PTA in the amount of $9,648.89.

The trial court granted Appellant a stay as to her sentence. This timely appeal followed.

<u>ASSIGNMENT OF ERROR NO. 1</u>

APPELLANT'S CONVICTION VIOLATED THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AS THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

*Sufficiency of the Evidence*

**{¶8}** The elements for grant theft are found within R.C. 2913.02(A)(2): "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent[.]"

**{¶9}** Appellant argues that she was authorized as president and treasurer to make expenditures in order to carry out the purposes of the PTA. Appellant asserts that the board is authorized to consent to these expenditures. She argues that she prepared treasurer's reports reflecting her expenditures and the board never objected to her reports. According to Appellant, multiple board members testified that they knew and approved of her expenditures. Additionally, Appellant urges that there is no evidence that any specific transaction was unauthorized.

{¶10} The state responds by arguing that Appellant refused to provide bank records to multiple PTA treasurers and would not give them access to the bank account. The state asserts that witnesses testified the board never authorized Appellant's expenditures, and that Appellant spent $9,648.89 out of the PTA's $14,000 budget on unauthorized purchases, including $230 in fuel purchases over the course of only four days. The state notes that the amount of unauthorized expenditures proven at trial does not include several other questionable expenditures. The state also cites testimony from several witnesses that the board does not reimburse for fuel purchases, nor do they permit ATM withdrawals.

{¶11} Preliminarily, it is noted that the element at issue is whether the expenditures were "[b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." Appellant attempts to portray this as two separate elements, however, the state need only prove that the expenditure at issue was beyond either the express or implied consent of the PTA board.

{¶12} "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49, (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.3d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing

court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Merritt*, 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 35.

{¶13} In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

{¶14} The state theorized at trial that Appellant took money out of the PTA account without permission and for her own personal use. Appellant admitted at trial that she used the PTA debit card to purchase fuel, meals at restaurants, and withdrew money through an ATM or by receiving cash back. She admittedly withdrew a significant amount of money through ATMs and cash back to reimburse herself for purchases she made using her own money. She also claimed that some of the money that she withdrew was used for startup money at various events hosted by the PTA. She also explained that she often took volunteers out for dinner to thank them for their help and paid for the meals through the debit card. She acknowledged that she did not follow the formal process to obtain a reimbursement.

{¶15} The first witness to testify was Det. Mondora. Det. Mondora testified that he met with Factor, Delgado, Koontz, and Hinkle to discuss the PTA account. (1/27/16 Tr., p. 115.) He obtained the PTA's bank records through subpoena and

reviewed the transactions with the board members and concluded that the transactions at issue were unauthorized. He testified that the group informed him that PTA members were not permitted to receive reimbursements for fuel purchases. (*Id.* at p. 156.) The board members explained to him that if a person sought a reimbursement for any purpose, they were required to provide the board with a receipt and the board would have to approve of the reimbursement.

{¶16} The second witness to testify was Bonnie Barlett who was president of the PTA while Appellant served as treasurer. Barlett testified that Appellant prepared a treasurer's report for each meeting. (*Id.* at p. 165.) The ATM withdrawals and fuel purchases were not included in these reports. She was unaware of anyone receiving reimbursement for fuel purchases, as the group is a volunteer based organization.

{¶17} Yvonne Rentz, a former treasurer of the PTA, testified that Appellant asked her to serve as treasurer but refused to add her to the bank account and would not provide her with financial records. (*Id.* at p. 202.) She resigned as treasurer because she was afraid to have her name associated with the account.

{¶18} Elaine Akers testified that she became treasurer after Rentz resigned. Appellant similarly refused to add her to the bank account or give her any financial records. (*Id.* at p. 221.) Eventually Appellant did give her some records, however, these records merely consisted of the front page of some bank statements and did not include the transaction history. Based on the limited records, Akers believed that large amounts of money were missing and she reached out to the Ohio PTA for guidance. (*Id.* at p. 226.) Based on its advice, Akers obtained a successful vote and

formed a new PTA. Akers did not remain on the newly created board. It is noted that Akers initially requested an audit of the account, however, she became ill and did not follow through with the audit. She returned $200 that was given to her to conduct the audit.

**{¶19}** Next, Sheila Factor testified for the state. Factor was selected as treasurer of the newly formed PTA. She obtained access to the PTA Huntington account through the bank and reviewed the online records. (*Id.* at p. 266.) Factor became concerned about some of the transactions and met with the new board and then the sheriff's office. Factor disputed the defense's theory that money from the ATM transactions was used as startup money for event ticket sales. Factor explained that an ATM does not dispense the small bills that would be used to make change for such events.

**{¶20}** Leo Fernandez, a BCI forensic accountant was the final witness to testify for the state. Fernandez testified that there were no official financial records for the PTA from January of 2011 to October of 2013. (*Id.* at p. 315.) Instead, he was forced to review bank records obtained from Huntington's online banking system. He noted that Appellant used the cash back function forty-two times to obtain $3,050. (*Id.* at p. 318.) He explained that cash back options are typically unauthorized among organizations. He also discovered twenty-six ATM withdrawals totaling $6,017.50. (*Id.* at p. 320.) He noted that twenty-three of the transactions were completed at non-Huntington ATMs and carried fees totaling $57.50. He stated that there were charges amounting to $261.32 at various restaurants. (*Id.* at p. 321.)

He explained that these charges were troubling as the average cost per restaurant was $44. He noted that there were charges totaling $320.07 for fuel purchases with an average price of $53. He explained that none of these transactions are authorized by the budget. The total amount of these unauthorized charges is $9,648.89.

{¶21} The first witness for the defense was James Epply, Appellant's husband. Epply claimed that he assisted Appellant in placing the financial records in boxes which were delivered to Akers. (*Id.* at p. 341.) According to Epply, the boxes contained numerous binders of bank records and receipts. He admitted that at least some of the money received through cash back and ATM withdrawals was intended to reimburse Appellant for money that she spent on the PTA using her own funds. He explained that the restaurant transactions paid for meals for volunteers, but admitted that his dinner was paid on at least one occasion that he could remember. (*Id.* at p. 351.)

{¶22} Angela Bouch, former vice president of the PTA, testified that Appellant told her at some point that she was using the debit card to purchase fuel but that the topic was never discussed with the board. (*Id.* at p. 369.) The state presented evidence that the PTA debit card was used to buy Bouch and Appellant meals at Bob Evans, however, Bouch testified that she did not know that Appellant used the PTA debit card. Bouch could not remember if these meals were related to PTA matters. Bouch testified that the PTA budget was typically $7,000 per year, $14,000 for two years. (*Id.* at p. 375.) Bouch admitted that cash withdrawals, service fees, food, and

fuel reimbursements were not included within the budget, even though these purchases amounted to $9,648.89 (69%) of the $14,000 budget over two years at issue.

**{¶23}** Jolene Robison, former PTA president, also testified for the defense. Robison admitted that purchases would be considered unauthorized if they excessively exceeded the budget. (*Id.* at p. 384.) She testified that she had been reimbursed for fuel purchases in the past, however, she had paid for the gas, submitted a receipt to the board and obtained board permission to receive a reimbursement. She also admitted that she infrequently sought reimbursement for fuel purchases. Robison opined that Appellant's purchase of $230 in fuel over the course of four days was reasonable for PTA purposes. (*Id.* at p. 392.)

**{¶24}** Laurie Strickland, the founder of the original PTA, was the final witness. Strickland testified that she always paid for her own fuel. (*Id.* at p. 409.) She testified that if someone did seek reimbursement, there was a formal process to follow.

**{¶25}** While there was evidence of other suspicious expenditures, the state agreed that those purchases could have conceivably been related to PTA purposes. As to the relevant expenditures, multiple witnesses testified that there was a formal process to follow if reimbursement is sought. The member must provide a receipt to the board and wait for approval before obtaining reimbursement. Appellant admittedly ignored this process and simply took PTA funds without providing a receipt. Appellant failed to provide a travel log to show her fuel purchases were PTA related. Additionally, due to the lack of receipts, Appellant was unable to account for

purchases made with the money withdrawn from the cash back transactions and ATMs.

**{¶26}** Similarly, Appellant did not obtain permission to use the debit card at restaurants. While she claimed these meals were meant to thank volunteers, this was not part of the PTA budget and her husband admittedly benefitted on at least one occasion. Further, the state presented evidence that at least one witness received multiple meals paid for using the debit card and there was no evidence that these were related to PTA matters.

**{¶27}** It is also significant that Appellant refused to provide financial records to multiple PTA treasurers and refused to add these persons to the bank account. When she finally gave Factor records, they included only the first page of the bank statements and omitted pages detailing the transactions. While Appellant claimed to have given Factor all of her receipts, the receipts in Factor's possession did not account for the vast majority of expenditures.

**{¶28}** It is apparent from these facts that the board never consented to Appellant's expenditures. Several witnesses testified that a formal process exists for reimbursements: a receipt must be produced and the board must authorize the reimbursement. Appellant admittedly never sought permission to be reimbursed and did not inform the board of her reimbursements. Appellant's own witness testified that the board was never notified of her expenditures as required. While Appellant argues that the board never objected to her monthly expense reports, she conceded

at oral argument that these reports were not itemized. Thus, there is no evidence that the board consented to certain specific expenditures.

**{¶29}** Based on this record, the state presented sufficient evidence to show that Appellant's expenditures were made without the consent of the board.

*Manifest Weight of the Evidence*

**{¶30}** Appellant argues that there is no evidence within the record to demonstrate she converted PTA funds to her own personal use. Instead, Appellant argues that all expenditures were made in furtherance of the PTA's purpose. Appellant highlights that the state admittedly could not prove how she spent the PTA funds.

**{¶31}** The state responds by arguing that several past and current members of the board, including officers, testified that there is a formal process for seeking reimbursement and that Appellant failed to follow the process. A person seeking reimbursement must bring receipts to the board and seek board permission prior to receiving reimbursement. The state contends that several board members testified that Appellant never asked for reimbursement, never presented receipts, and was never granted permission to receive any reimbursement.

**{¶32}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387. It is not a question of mathematics but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J.

concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387. This discretionary power of the appellate court is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶33}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 20 N.E.2d 650 (1971). As such, when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶34}** As previously discussed, multiple witnesses, including defense witnesses, testified that there is a formal reimbursement process. A person seeking a reimbursement must provide the board with a receipt and the board must then authorize the reimbursement. Presumably, a person must use their own funds to make the initial purchase.

**{¶35}** Appellant admittedly did not follow the process. Instead of spending her own money, Appellant used the PTA debit card to make initial purchases. Appellant never discussed these purchases with the board and her expenditures were not authorized by the budget or the board. Appellant took money, allegedly to reimburse herself, without providing receipts or getting prior authorization for reimbursement. While Appellant claims that these expenditures were accounted for within her monthly reports, several witnesses testified that expenditures were not broken down as fuel purchases, withdrawals, or restaurant meals.

**{¶36}** As such, the record contains competent credible evidence that Appellant exerted control over the funds without the consent of the PTA board. Accordingly, Appellant's first assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 2</u>

APPELLANT WAS PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF COUNSEL.

**{¶37}** The test for an ineffective assistance of counsel claim is two-part: whether trial counsel's performance was deficient and, if so, whether the deficiency resulted in prejudice. *State v. White*, 7th Dist. No. 13 JE 33, 2014-Ohio-4153, ¶ 18,

citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 107. To prevail on a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Lyons*, 7th Dist. No. 14 BE 28, 2015-Ohio-3325, ¶ 11, citing *Strickland* at 694.

**{¶38}** Appellant argues that she received ineffective assistance of counsel in two instances. First, she claims that trial counsel's decision to stipulate to the admission of a report filed by Det. Mondora was deficient. Second, she claims that defense counsel was ineffective for admitting that she took PTA money.

**{¶39}** The state responds by citing to an Ohio Supreme Court decision which held that approval of a report containing witness statements, unhelpful psychological reports, and the defendant's prior record did not amount to plain error. See *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Based on the logic of the *Bradley* Court, the state argues that the admission of Det. Mondora's report did not constitute ineffective assistance of counsel. As to counsel's defense tactic, the state argues that once it was established that Appellant used the PTA debit card for questionable purchases, counsel's defense that Appellant had the full consent of the PTA to use the card to make those purchases was reasonable.

**{¶40}** As to counsel's failure to object to Det. Mondora's report, "police reports that 'recite an officer's observations of criminal activities or observations made as

part of an investigation of criminal activities' are inadmissible hearsay." *State v. Albright*, 7th Dist. No. 14 MA 0165, 2016-Ohio-7037, ¶ 64, citing *State v. Leonard*, 104 Ohio St.3d 54, 75, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 111; *State v. Ward*, 15 Ohio St.3d 355, 358, 474 N.E.2d 300 (1984). However, even if an appellant is able to show that the report was inadmissible, the appellant must demonstrate prejudice. *Id.*

**{¶41}** Defense counsel effectively used Det. Mondora's report to show that a large number of transactions that were labeled "unauthorized" had been, in fact, authorized. Additionally, defense counsel argued throughout the trial that the bylaws did not expressly forbid an officer from receiving a reimbursement and did not expressly state the reimbursement policy. The bylaws were outlined within Det. Mondora's report. Thus, it was reasonable trial strategy to allow the jury to have the report. Regardless, Appellant has not argued that but for the ineffectiveness of defense counsel, the outcome would have changed. At best, defense counsel's failure to object here was harmless. As noted, counsel actually used the report to aid the defense. As such, Appellant was not prejudiced by defense counsel's failure to object to the report.

**{¶42}** As to Appellant's argument regarding defense counsel's trial strategy, trial counsel's decision "regarding which defense to pursue at trial is a matter of trial strategy 'within the exclusive province of defense counsel to make after consultation with his client.' " *State v. Brown,* 7th Dist. No. 03 MA 231, 2005-Ohio-4502, ¶ 13, citing *State v. Murphy*, 91 Ohio St.3d 516, 524, 747 N.E.2d 765 (2001). We can only

find counsel's performance on matters of strategy is deficient if counsel's trial strategy was so "outside the realm of legitimate trial strategy so as 'to make ordinary counsel scoff.' " *Brown* at ¶ 13, citing *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 39 (2d Dist.); *State v. Yarber*, 102 Ohio App.3d 185, 188, 656 N.E.2d 1322 (12th Dist.1995.). Defense counsel's strategy to argue consent is reasonable, here, as the state had an abundance of evidence demonstrating that Appellant used the debit card to make purchases for non-PTA expenditures. It does not appear that counsel was faced with another reasonable defense to present.

**{¶43}** Accordingly, Appellant's second assignment of error is without merit and is overruled.

## Conclusion

**{¶44}** Appellant argues that her convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Appellant also argues that she received ineffective assistance of counsel. However, the record provides sufficient, competent, and credible evidence to support Appellant's convictions. Further, Appellant is unable to show that she received ineffective assistance of counsel. Accordingly, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Robb, P.J., concurs.