[Cite as *State v. Craig*, 2021-Ohio-2790.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                      Court of Appeals No. WD-20-034

    Appellee                                  Trial Court No.  2018CR0437

v.

Harold Jason Craig                           **DECISION AND JUDGMENT**

    Appellant                                  Decided:  August 13, 2021

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl and William V. Stephenson, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} Appellant, Harold Craig, appeals the judgment of the Wood County Court of

Common Pleas, sentencing him to seven years in prison after a jury found him guilty of

one count of engaging in a pattern of corrupt activity, one count of aggravated theft, and

three counts of money laundering.

## A. Facts and Procedural Background

{¶ 2} On September 20, 2018, appellant was indicted on one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) and (B)(1), a felony of the first degree, one count of aggravated theft in violation of R.C. 2913.02(A)(2) and (B)(2), a felony of the third degree, and four counts of money laundering in violation of R.C. 1315.55(A)(3) and R.C. 1315.99(C), felonies of the third degree. On the first day of trial in this case, the state dismissed one of the money laundering counts.

{¶ 3} These charges stem from actions taken by appellant during his time as treasurer of a nonprofit organization known as the Perrysburg Heights Community Association (hereinafter referred to as "PHCA"). The charge of engaging in a pattern of corrupt activity was based upon the allegation that appellant, acting in concert with his girlfriend, Kristie Koester, committed eleven incidents of corrupt activity, which were specifically identified in the indictment, as follows:

> Incident One: On or about August 1, 2012 to December 31, 2015, Harold Jason Craig, in Wood County, did with purpose to deprive the owner, Perrysburg Heights Community Association, of $238,360.31, knowingly obtain or exert control over the property beyond the scope of the express or implied consent of the owner or person authorized to give content. The aforementioned conduct constituted and/or involved a violation of R.C. 2913.02(A), 2913.02(B), Aggravated Theft, a felony of the third degree.

2.

Incident Two: On or about September 24, 2012, Harold Jason Craig, in Wood County, deposited $2,939.95, which was a commission for the sale of Visalus Products for Perrysburg Heights Community Association, into a personal account at Genoa Bank over which he had control. The aforementioned conduct constituted and/or involved a violation of R.C. 1315.55(A), 1315.99(C), Money Laundering, a felony of the third degree.

Incident Three: On or about October 11, 2012, Harold Jason Craig, in Wood County, purchased three parcels of land from the Wood County Sheriff's Department with check #228 from a personal account at Genoa Bank over which he had control. The aforementioned conduct constituted and/or involved a violation of R.C. 1315.55(A), 1315.99(C), Money Laundering, a felony of the third degree.

Incident Four: On or about December 19, 2012, Harold Jason Craig, in Wood County, withdrew $25,000 from the Perrysburg Heights Community Association's Key Bank account. The aforementioned conduct constituted and/or involved a violation of R.C. 1315.55(A), 1315.99(C), Money Laundering, a felony of the third degree and R.C. 2913.02(A), 2913.02(B), Theft, a felony of the fourth degree.

Incident Five: On or about December 19, 2012, Harold Jason Craig, in Wood County, deposited $25,000 into a personal account at Huntington Bank over which he had control. The aforementioned conduct constituted

3.

and/or involved a violation of R.C. 1315.55(A), 1315.99(C), Money Laundering, a felony of the third degree.

Incident Six: On or about December 20, 2012, Harold Jason Craig, in Wood County, wrote check #1008 from his personal account at Huntington Bank in the amount of $13,000 to the Wood County Sheriff's Office. The aforementioned conduct constituted and/or involved a violation of R.C. 1315.55(A), 1315.99(C), Money Laundering, a felony of the third degree.

Incident Seven: On or about October 22, 2012, Harold Jason Craig, in Wood County, did with purpose to deprive the owner, Perrysburg Heights Community Association, withdrew $1,200, from Perrysburg Heights Community Association's Key Bank account. The aforementioned conduct constituted and/or involved a violation of R.C. 2913.02(A), 2913.02(B), Theft, a felony of the fifth degree.

Incident Eight: On or about November 2, 2012, Harold Jason Craig, in Wood County, did with purpose to deprive the owner, Perrysburg Heights Community Association, withdrew $1,000, from Perrysburg Heights Community Association's Key Bank account. The aforementioned conduct constituted and/or involved a violation of R.C. 2913.02(A), 2913.02(B), Theft, a felony of the fifth degree.

4.

Incident Nine: On or about November 8, 2012, Harold Jason Craig, in Wood County, did with purpose to deprive the owner, Perrysburg Heights Community Association, withdrew $7,000, from Perrysburg Heights Community Association's Key Bank account. The aforementioned conduct constituted and/or involved a violation of R.C. 2913.02(A), 2913.02(B), Theft, a felony of the fifth degree.

Incident Ten: On or about December 19, 2012, Harold Jason Craig, in Wood County, did with purpose to deprive the owner, Perrysburg Heights Community Association, withdrew $5,000, from Perrysburg Heights Community Association's Key Bank account. The aforementioned conduct constituted and/or involved a violation of R.C. 2913.02(A), 2913.02(B), Theft, a felony of the fifth degree.

Incident Eleven: On or about August 9, 2013, Harold Jason Craig, in Wood County, did with purpose to deprive the owner, Perrysburg Heights Community Association, withdrew $4,000 from Perrysburg Heights Community Association's Key Bank account. The aforementioned conduct constituted and/or involved a violation of R.C. 2913.02(A), 2913.02(B), Theft, a felony of the fifth degree.

{¶ 4} Relatedly, the charge of aggravated theft was premised upon appellant's alleged gradual embezzlement of PHCA funds totaling $238,360.31 from August 1, 2012, to December 31, 2015. The charges of money laundering were based upon three

5.

specific transactions: (1) appellant's October 11, 2012 remittance of $3,000 to the Wood County Sheriff's Department as a deposit toward the purchase of three parcels of real property (the "investment properties"); (2) appellant's December 19, 2012 withdrawal of $25,000 from PHCA's Key Bank medical clinic account and subsequent deposit into an investment account owned by Koester; and (3) appellant's December 20, 2012 remittance of $13,000 (alleged to have come from the $25,000 he withdrew from the medical clinic account) to the Wood County Sheriff's Department to pay for the remaining balance on the investment properties, which were then titled in Koester's name.

{¶ 5} Appellant pled not guilty to the aforementioned charges, and the matter proceeded through pretrial discovery and motion practice, culminating in a five-day jury trial that commenced on January 27, 2020.

{¶ 6} At trial, the state called Anita Serda, the founder of PHCA, for its first witness. Anita testified that she organized PHCA in 1991 in order to ensure that residents of the Perrysburg Heights community in Perrysburg Township would have access to educational, recreational, and social opportunities. At its formation, PHCA was run by a Board of Trustees (hereinafter referred to as the "Board") consisting of 22 members, half of whom were residents of Perrysburg Heights.[1] Anita was a Board member every year, save one, from the founding of the organization until 2012. Further, Anita served PHCA

---

[1] Anita testified that the number of Board members fluctuated over time, at times falling to as few as five members.

in various roles during her time as Board member, including vice president, president, and executive director. Anita eventually resigned from PHCA in May 2013.

{¶ 7} Initially, PHCA acquired a three-room job site trailer in 1992 and began after-school tutoring, a library reading program, and GED programs for adults in that facility. After a few years, PHCA was able to obtain a federal grant that enabled it to build the first phase of a community center. A second phase, consisting of the construction of two additional meeting rooms, was completed in 1997.

{¶ 8} Regarding the administration of PHCA, Anita indicated that the Board met on a monthly basis. PHCA also solicited the help of an outside agency to conduct audits of the organization's financials in order to ensure it was compliant with federal tax laws regulating nonprofit organizations. During Anita's involvement with PHCA, the organization had one checking account that was used to fund its operating budget, as well as an account that generated interest by way of a certificate of deposit.

{¶ 9} Anita testified that the operations of PHCA were funded exclusively from federal grants and community donations during its early years. She further explained that the work of the organization was performed on a volunteer basis by PHCA Board members. PHCA generally did not have a paid staff. However, the organization was occasionally able to secure small grants from AmeriCorps, which allowed it to hire an employee from time to time. Local fundraisers were organized in order to maintain the cost of running the PHCA's community center. These fundraisers included community dinners, garage sales, and a community festival known as the South of the Border

7.

festival. Anita testified that "at least a quarter" of the PHCA's annual budget was funded by the proceeds generated from the festival.

{¶ 10} At some point prior to the completion of the second phase of the community center, PHCA developed a relationship with the Bowling Green State University College of Education. This relationship led to the awarding of what Anita described as a "very large grant" that was used to provide twice weekly tutoring for children under the guidance of undergraduate students from the university. In order to secure the grant, PHCA was required to appoint a fiscal agent. PHCA selected Bowling Green State University College of Education as its fiscal agent.

{¶ 11} In addition to its relationship with the Bowling Green State University College of Education, PHCA developed a partnership with the Boys & Girls Club that lasted for "about five or six years." During this time, the Boys & Girls Club operated PHCA's structured programming and paid for personnel costs associated with the programs. Pursuant to this partnership, PHCA was only responsible for the payment of facility expenses for the community center. Eventually, the partnership with Boys & Girls Club expired, and was replaced by a similar partnership with the YMCA of Perrysburg.

{¶ 12} In 2007, PHCA completed construction on a third phase to its community center, which included another meeting room and a full-sized gymnasium. Phase three cost $1,300,000, which was funded using a multi-year fundraising campaign that raised the money from individual pledges and financial support from Perrysburg Township.

8.

PHCA associated with the Greater Toledo Community Foundation (hereinafter referred to as the "TCF") during these fundraising efforts, establishing an endowment that donors could continue to contribute toward in order to fund the organization. Anita testified that the balance in the endowment fund as of 2012 "was over $300,000." This balance generated interest from which PHCA regularly received distributions. Given these resources, Anita explained that PHCA was able to keep the community center operational without interruption from its inception in 1995 until 2012. According to Anita, "[t]here was never a time that there was a threat to close the community center or the programs."

{¶ 13} During the late 2000s, PHCA established a relationship with Dr. Richard Paat, and the partnership resulted in the creation of a medical clinic offering free medical services to community members. Dr. Paat ran the clinic out of PHCA's community center on a rent-free basis and paid all of the non-facility expenses of the clinic with his own funds. Anita indicated that the Board revisited the rent issue sometime in 2011 or 2012 and decided to begin charging rent for Dr. Paat's medical clinic. This decision prompted Dr. Paat to find another facility from which to operate the clinic, and PHCA ceased offering medical services thereafter.

{¶ 14} Anita testified that she appointed appellant to PHCA's Board shortly before her involvement with PHCA came to an end. Anita knew appellant, a resident of Perrysburg Heights, from his longtime active involvement with PHCA dating back to the time of his youth. Anita also indicated that she was familiar with Kristie Koester, whom she believed to be appellant's wife.

9.

{¶ 15} During her testimony, Anita recalled appellant's election as treasurer of the Board. Anita testified that appellant was reluctant to assume the volunteer role of treasurer, but ultimately agreed to accept the position. According to Anita, PHCA had a "very solid system of record keeping." Anita testified that the treasurer regularly provided monthly reports to the Board for its review and approval. Describing the Board's routine practice at its regular meetings, Anita stated:

> Just like any Board we started off with the opening of the meeting. We sent out Board reports prior to the meeting so that we weren't spending hours there, gave everybody the opportunity to read minutes from the previous Board meeting, treasurer's reports, and the executive director's report. So that when you then came to the meeting it was just motions that you generally were prepared to vote on. * * * Unfortunately we started not having all the financial records prepared and presented to the Board members on a monthly basis. So there are many times we could not approve the treasurer's report because we did not have that to look at.

{¶ 16} Anita testified that issues with financial record-keeping began after appellant assumed the role of treasurer. Specifically, Anita stated that appellant provided treasurer's reports only once every four months, and failed to do so in a manner that would permit PHCA's Board to review such reports prior to its monthly meetings. According to Anita, the Board addressed this matter with appellant, but "[h]e just always had a reason why he didn't have time to get it done. But we could not approve Board

10.

meeting minutes or the treasurer's report until we saw the records. So we would go several months without approval." On cross examination, Anita acknowledged that Board members had access to the organization's check registry and QuickBooks accounting software.

{¶ 17} During appellant's involvement in PHCA, the organization's fundraising efforts expanded from on-site activities and the South of the Border Festival to the sale of gift cards and ViSalus nutritional supplements. Regarding this expansion of fundraising, Anita explained "there were a lot of changes in [fundraising] that were not the way that the Board had been generating revenue over the years."

{¶ 18} Notwithstanding these ongoing fundraising efforts, appellant informed the Board in the spring of 2013 that PHCA was financially struggling. Anita stated that "there wasn't really anything that [the Board] could look at to determine that other than his verification." She explained that appellant had not provided PHCA's Board with any financial reports that would substantiate appellant's assertion that the organization was financially strained.

{¶ 19} On May 20, 2013, a conversation took place concerning the need to close the community center and stop paying PHCA salaried employees until such time as PHCA could generate more revenue. At a special Board meeting held on May 28, 2013, community members and interested organizations gathered to voice their support for PHCA.

11.

{¶ 20} At the meeting, Anita's daughter, Stephanie Serda, called for a vote from the Board to remove appellant from his position as treasurer. Following a "very heated discussion," the Board voted to retain appellant as treasurer and remove Anita from her role in the organization. Anita decided to resign from her position at that time. Stephanie also decided to resign from her position as president of PHCA at that time.

{¶ 21} As its second witness, the state called Stephanie. In June 2011, Stephanie was hired by PHCA as its program director. Prior to this time, Stephanie was a YMCA youth counselor located at PHCA's community center. Stephanie also volunteered at PHCA, and later joined the PHCA Board, ultimately becoming the president of the Board in 2012.

{¶ 22} According to Stephanie, appellant became treasurer of the Board at approximately the same time as she became president. Stephanie testified that she interacted with appellant on a daily basis from 2011 through 2013. She went on to testify about appellant's preparation of treasurer reports during this time period. According to Stephanie, appellant's reports "wouldn't look exactly the same as they did before." She explained that "many times [appellant] came in late to the meetings because he was working on the reports at the last minute," and she noted the lack of detail in appellant's reports. While previous treasurers would prepare reports that were "line by line, check by check," appellant merely provided a "summary of this is how much we have in this account. Other times it wasn't even an actual like electronic version like e-mailed out. It would be verbally spoken at the meetings."

12.

{¶ 23} Similar to Anita, Stephanie testified that PHCA used two bank accounts; a "CD account" and a regular checking account used for operating expenses. When asked whether PHCA had a need for a separate bank account for medical expenses, Stephanie responded in the negative. Stephanie explained that the medical clinic run by Dr. Paat was self-funded, and no medical clinic remained at PHCA once Dr. Paat moved his clinic elsewhere.

{¶ 24} Stephanie first became aware of PHCA's financial difficulties in 2012, when appellant informed her that the organization needed to raise additional funds. Appellant and Stephanie began to discuss fundraising ideas at this time. During these discussions, appellant proposed real estate investment as a means to raise money for PHCA. According to Stephanie, appellant informed her that he wanted to purchase properties in Perrysburg Heights and then sell the properties to a developer at a later date, "once the neighborhood was no more." Stephanie indicated that appellant told her he had won the Illinois lottery and thus wanted to purchase the properties using his own funds.[2] Appellant was unemployed at the time.

{¶ 25} In addition to his idea to purchase and hold real estate for sale at a later date, appellant raised the prospect of having PHCA purchase investment properties in Perrysburg Heights. At the time, Stephanie voiced concerns over whether PHCA was

[2] During her trial testimony, Koester stated that appellant never won the lottery. Instead, she testified that she had won $50,000 in the Illinois lottery when she lived in that state, sometime in 2003 or 2004.

13.

permitted to invest in real estate as a nonprofit organization. Moreover, Stephanie testified that the Board did not approve appellant's plan to purchase real estate while she was president of the Board. At the time, Stephanie understood that appellant had an out-of-state business partner who helped him purchase properties "together for themselves, not for PHCA." She explained that such purchases were not associated with PHCA, "so it wasn't my business."

{¶ 26} Stephanie recounted further fundraising ideas proposed by appellant in 2013, including the use of a vending machine in the community center, the sale of Speedway gift cards, and the sale of ViSalus nutritional supplements. Specific to the ViSalus idea, Stephanie testified that appellant wanted her and another PHCA worker, Spencer Moody, to sign up to sell the products in their personal capacities and then "donate the proceeds to the community center." Appellant indicated to Stephanie that the commissions generated from the sale of ViSalus products would inure to the benefit of PHCA. Stephanie explained that she never personally sold any ViSalus products, but that appellant managed the program and sold the products on the internet under her name. Upon receiving commission checks from ViSalus for the online sales generated in her name, Stephanie signed them and delivered them to appellant for him to deposit into an account for the benefit of PHCA.

{¶ 27} The state introduced copies of such commission checks, one of which included a forged signature purporting to be Stephanie's signature. Stephanie testified that she did not sign this check, which was dated April 12, 2013. The words "pay to the

14.

order of C-Dude Investments" were written underneath Stephanie's signature, and the check was then signed by Koester. Koester was subsequently identified as appellant's girlfriend and C-Dude Investments was determined to be a business entity formed by appellant and Koester. At trial, Stephanie testified that she had not seen this check before prosecutors showed it to her in connection with this case. Further, Stephanie testified that she did not give the check to Koester, and did not authorize Koester to deposit it into the C-Dude account. According to Stephanie, she would normally sign over her ViSalus commission checks to appellant so that he could deposit them for PHCA. On cross examination, Stephanie acknowledged that PHCA did, in fact, receive income from the sale of ViSalus products. She further agreed that appellant's fundraising ideas, including the installation of vending machines and the sale of gift cards, generated some income for PHCA.

{¶ 28} Following Stephanie's testimony, the state called Elisa Rodriguez as its third witness. Rodriguez began volunteering for PHCA in 2006, and was subsequently elected to the Board shortly thereafter. In addition to joining the Board, Rodriguez was elected as the treasurer of PHCA in 2009. She resigned from that position in 2012.

{¶ 29} During her testimony, Rodriguez explained the duties of a PHCA treasurer. She testified that she paid the bills, made necessary purchases of supplies for PHCA, and prepared a treasurer's report prior to each monthly Board meeting. Rodriguez testified that her monthly reports listed each expenditure incurred for the month. She estimated that she would write approximately 30 checks per month. Other than cash payments to

festival entertainers, all other expenses were paid by check. Rodriguez elaborated that she used checks instead of cash or debit/credit cards to pay expenses and reimburse PHCA employees for their expenses because she "needed a paper trail."[3] Further, Rodriguez recalled that "[m]ajor purchases we would have to discuss at a meeting, like if it was something huge." She went on to identify tables, chairs, and bulk floor cleaner as items that fell into the category of purchases for which Board preapproval was required.

{¶ 30} Rodriguez testified that all of the financial operations of PHCA were conducted using one "main account" at the Huntington Bank branch located in Perrysburg. According to Rodriguez, PHCA's main account was divided into three subaccounts consisting of one subaccount for operations, one subaccount for the South of the Border Festival, and one fundraising subaccount. Rodriguez did not recall PHCA ever using a medical account at Huntington Bank during her time as treasurer. Each month, prior to the Board meetings, Rodriguez used a Microsoft Excel spreadsheet to reconcile the Huntington account with the utility bills and check payment receipts she stored in a white file box. Upon her resignation from her position as treasurer in 2012, Rodriguez delivered the file box to appellant.

{¶ 31} Regarding PHCA's financial condition during her time with the organization, Rodriguez testified that PHCA only had to request additional yearly funds

---

[3] Rodriguez acknowledged that PHCA used a Sam's Club store card from time to time, but stated that such card was not a debit or credit card that could be used outside of Sam's Club stores.

from TCF on one occasion. She explained that this financial need was predicated upon poor performance from the South of the Border Festival, which was PHCA's primary source of revenue each year.

{¶ 32} For its fourth witness, the state called Spencer Moody, a former PHCA intern. During his time as a PHCA intern, Moody was involved in the sale of ViSalus products. At trial, Moody testified that he received several commission checks in connection with his ViSalus sales, which he then signed over to appellant for deposit. Moody stated that he received a small portion of the commissions for his personal use, and he indicated his understanding that the remaining proceeds from the commission checks would be used for the benefit of PHCA.

{¶ 33} Following Moody's testimony, the state called Corey Pratt as its fifth witness. Pratt is a former interim chief investigator for the charitable law section of the Ohio Attorney General's office. In that role, Pratt investigated citizen reports of unlawful use of charitable funds.

{¶ 34} In July 2013, Pratt began receiving complaints involving PHCA, which prompted the launching of an investigation. Pratt testified, without objection, that these complaints raised numerous issues, including allegations of an organizational coup, a lack of open door meetings, violations of Ohio's Sunshine Law, and improper use of fundraising money. According to Pratt, the issues raised in the complaints were "literally all over the board."

17.

{¶ 35} Three months after receiving these complaints, Pratt sent a "very lengthy record request" to the then-president of PHCA, Jesse Spier, in which he sought information regarding the organization's Board and its finances. In order to facilitate his investigation of PHCA, Pratt requested PHCA's bank records, meeting minutes, articles of incorporation, and organizational bylaws. Pratt testified that PHCA's response to his request failed to include much of the requested information. The lack of information from PHCA led Pratt to conduct in-person interviews of four individuals, including appellant.

{¶ 36} During his interview with appellant, Pratt discussed PHCA's finances and fundraising, and requested documentation of the organization's expenditures, as well as PHCA's bank statements and meeting minutes. Pratt described appellant's fundraising efforts as "the craziest set of fundraisers I have ever seen." Pratt testified that appellant's fundraising efforts were all cash-based and thus hard to trace, which he indicated was a "huge red flag" that prompted further investigation. At some point during Pratt's interview of appellant, appellant outlined the procedure behind the sale of ViSalus products. According to Pratt, appellant "claimed he was buying [the [products] with his money, then selling it and turning all the profits in to the organization."

{¶ 37} After a three-year investigation, protracted by what Pratt described as PHCA's failure to provide requested information, the Ohio Attorney General's office decided to refer the matter to the Wood County Prosecutor's office for further investigation into possible criminal charges.

18.

{¶ 38} For its sixth witness, the state called Ashley Clifton, a charitable fund auditor who was employed within the charitable law section of the Ohio Attorney General's office from January 2013 until September 2019. Clifton was one member of the four-person investigative team that included Pratt, an attorney, and a compliance examiner. Working alongside Pratt during the Ohio Attorney General's investigation of PHCA, Clifton reviewed and analyzed the financial records of PHCA to determine if there was any misappropriation of assets within the organization, and then prepared a summary of all withdrawals from PHCA's bank accounts.

{¶ 39} During her testimony, Clifton expressed her suspicion surrounding certain transactions for "different products that did not appear to further the charitable mission of the organization." She went on to identify those products, which included PlayStation video game consoles, Speedway gift cards, and ViSalus products. The total expenditure on these items amounted to $134,255.90. Clifton was informed that these products were used for fundraising purposes.

{¶ 40} In the course of her investigation, Clifton also noticed that checks were written from PHCA to C-Dude, and she testified that she was unable to ascertain a reason for such checks. Further, Clifton testified that appellant made various cash withdrawals from PHCA Key Bank accounts without an explanation as to why such withdrawals were made. These withdrawals, made during the time period from 2012-2014, totaled $99,621.53. According to Clifton, a total of $77,374.69 was withdrawn from the TCF endowment fund during that time period. On cross examination, Clifton acknowledged

19.

that some of those funds were withdrawn from the endowment fund prior to June 2012, when appellant became treasurer.

{¶ 41} Following Clifton's testimony, the state called Koester as its seventh witness. At the outset of her testimony, Koester indicated that she ended her relationship with appellant in 2016. The couple met in 1997 and began cohabitating thereafter, but never married.

{¶ 42} Koester, a resident of Perrysburg Heights, began volunteering at PHCA in 2012. Koester was elected to the Board that same year, and held that position from 2012 until 2016. Koester testified that appellant was the treasurer during this time period, and as such, he had the authority to write checks on behalf of PHCA.

{¶ 43} In 2014, PHCA contracted with Koester for janitorial services. Koester explained that she was paid a fee for her services, and she further stated that she was occasionally reimbursed for supplies that she purchased using her personal funds. Koester indicated that she was always paid by check, and she denied ever receiving compensation in the form of cash.

{¶ 44} According to Koester, appellant did not have a personal bank account. Instead, he used Koester's Genoa Bank account in order to pay the couple's household expenses. In addition to her Genoa Bank account, Koester opened a personal checking, savings, and credit card account at Huntington Bank in March 2013, in order to secure a mortgage. Koester insisted that she did not authorize appellant to issue checks on her behalf out of her Genoa Bank and Huntington accounts, although appellant did have a

20.

debit card associated with the Genoa Bank account, which she permitted him to use for household expenses. Koester testified that appellant was solely responsible for managing the household finances, and she indicated that she had no involvement in the couple's personal finances.

{¶ 45} In addition to her personal bank accounts, Koester acknowledged that she and appellant opened an investment account prior to 2010 in conjunction with their formation of C-Dude Investments. Koester and appellant formed the entity with another individual, Dellwood Smith, for the purpose of investing in rental properties in Perrysburg Heights. At trial, Koester testified that she owned four rental properties from 2012 through 2014, all of which were titled in her name rather than held by C-Dude Investments. The rent payments generated from these properties were deposited into Koester's Genoa Bank account, not the C-Dude account. According to Koester, all of the properties were foreclosed upon in 2016 due to alleged failure to make mortgage payments.

{¶ 46} During her testimony, Koester verified that funds from her Genoa Bank account were used to place a $3,000 deposit on one of these properties, located on Harold Street, which she and appellant purchased at a Sheriff's auction on October 11, 2012. Later in the month of October 2012, Koester and appellant wrote another check from Koester's Genoa Bank account, payable to the Wood County Sheriff's Department in the amount of $4,200 sale, to make an additional payment toward the balance owed on the Harold Street property.

21.

**{¶ 47}** On March 16, 2013, Koester withdrew $15,000 from her Genoa Bank account. She surmised that this money was used to purchase another property, but she could not be sure. Further, she was unable to identify the source of these funds. On May 29, 2013, Koester and appellant issued another check, payable to the Wood County Sheriff in the amount of $1,000, to purchase a foreclosed property. Koester admitted that appellant was unemployed during the period of time from 2012 through 2014, and stated that she generated income exclusively from dog grooming and janitorial work for PHCA.

**{¶ 48}** Turning to appellant's ViSalus fundraising activities, Koester testified that she participated with appellant in selling ViSalus products over the internet. She acknowledged that "Harold did the eBay auctions: but it was the community center's account." Koester responded in the affirmative when asked whether the profits from ViSalus were supposed to go to PHCA. She elaborated, "I sold it before it was an actual fundraiser for the community center. And then after it went to that we were strictly doing it online for the community center." Koester further agreed that others from PHCA were solicited to participate in the sale of ViSalus products with the understanding that the profits would be used for PHCA's benefit. Notwithstanding these admissions, Koester confirmed that ViSalus commission checks were deposited into her personal Genoa Bank account. When pressed for a reason why these checks were deposited into her Genoa Bank account, Koester indicated she was not sure but speculated that the funds were used to purchase more ViSalus products.

22.

{¶ 49} As her testimony continued, Koester explained another fundraiser idea implemented by appellant at PHCA. This fundraiser involved collecting large quantities of pennies and sorting them to find any pre-1982 pennies, which reportedly contain a high concentration of copper that makes them worth more than face value. According to Koester, this penny fundraiser was undertaken for the benefit of PHCA, and the profits generated thereby were supposed to benefit the organization.

{¶ 50} At the close of Koester's testimony, the state called Dr. Paat for its eighth witness. Dr. Paat testified that he opened a free medical clinic at PHCA's community center in January 2010. He went on to indicate that he operated the clinic for two years and then eventually moved the clinic to a nearby church after PHCA demanded that he pay rent to continue operating at the community center. Dr. Paat testified that the clinic was its own nonprofit entity, which managed its finances internally using its own bank accounts, with no assistance from PHCA beyond the rent-free use of the facility.

{¶ 51} For its ninth witness, the state called Phyllis Haas. In her position as a deputy with the Wood County Sheriff's Department, Haas manages financial affairs including sheriff's sales and payroll. Haas described the process of sheriff's sales, stating that a deposit of ten percent of the purchase price is due at the time of purchase, and the balance of the purchase price is due within 30 days of the date the purchase paperwork is forwarded to her office. She indicated that the deposit is payable by personal check or bank check.

23.

{¶ 52} Regarding her involvement in this case, Haas testified that she recognized appellant from his participation in several sheriff's sales over the years. Specifically, she recalled processing the paperwork and payments for appellant's purchase of three properties located on Washington Street in Perrysburg in the fourth quarter of 2012. Haas testified that the properties were purchased by appellant using checks from C-Dude's Investment account and Koester's Genoa Bank account. Haas authenticated several such checks, remitted by appellant, including two $1,000 checks, dated October 11, 2012, a $13,000 check, dated December 21, 2012, and a $3,100 check, dated December 21, 2012. The $13,000 check and the $3,100 check were signed by Koester and were drawn upon the C-Dude investment account. Haas stated that appellant did all the bidding on the properties, but noted that the properties were titled in Koester's name.

{¶ 53} For its tenth and final witness, the state called Douglas Kinder. Kinder is currently employed by the Wood County Prosecutor as an investigator. Upon referral of this case from the Ohio Attorney General's office in September 2016, Kinder conducted an investigation that involved reviewing the records produced by the Attorney General, subpoenaing banking information, and auditing the financial records of PHCA, C-Dude, and Koester. At the conclusion of his investigation, Kinder prepared a report that summarized his findings.

{¶ 54} During his testimony at trial, Kinder authenticated and discussed the voluminous financial records that were admitted into the record at trial, which he examined during his investigation in this case. Notably, Kinder testified that the

24.

accounting reports appellant provided to the Ohio Attorney General's office did not contain several financial transactions in which PHCA funds were disbursed to appellant or Koester. Nonetheless, upon examination of the records, Kinder was able to trace the flow of funds from PHCA to appellant or Koester via cash withdrawals, Koester's bank accounts, and the C-Dude investment account during the relevant time period indicated in the indictment. Kinder summarized the results of his tracing of PHCA funds in a PowerPoint presentation, which contained a slide that indicated a total of $238,360.31 in funds that were unaccounted for.[4] This total was subdivided into categories based upon the source and destination of the funds within each category. Kinder testified as to each category at trial, referencing supporting financial documents as he did so.

{¶ 55} First, Kinder testified that appellant withdrew cash from PHCA's Key Bank accounts totaling $51,636.53. Kinder stated that he was unable to track the flow of that money after it was withdrawn from PHCA's accounts from 2012 through 2015. Second, Kinder testified that a total of $7,438 was withdrawn from PHCA's PayPal account using a debit card attached to the account. Third, Kinder traced the ViSalus commission deposits associated with PHCA fundraising activities that went into the C-Dude investment account, and indicated that the total of these deposits was $40,710.35.[5]

---

[4] Kinder also observed over $70,000 in deposits into these accounts, which he excluded from the total because he could not trace the source of those funds.
[5] Kinder later explained that he reviewed PHCA's profit/loss statement, and noticed that there was no documentation of the ViSalus commission checks appellant deposited into the C-Dude investment account and Koester's bank accounts.

25.

Fourth, Kinder found that checks associated with PHCA's eBay account totaling $714.50 were deposited into the C-Dude investment account. Fifth, Kinder identified a total of $36,454 in check deposits into the C-Dude investment account from PHCA's bank accounts. Sixth, Kinder traced the ViSalus commission deposits associated with PHCA fundraising activities that went into Koester's Huntington Bank account, which totaled $1,815.74. Seventh, Kinder stated that a total of $9,313.46 in checks from PHCA bank accounts were deposited into Koester's Huntington Bank account. Eighth, Kinder traced an additional $6,721.66 in checks from PHCA bank accounts that were deposited into Koester's Genoa Bank account. Ninth, Kinder identified several ViSalus commission deposits totaling $19,582.06 that went into Koester's Genoa Bank account rather than PHCA's accounts. Tenth, Kinder traced $63,974.01 in funds associated with PHCA's PayPal account that were directly deposited into Koester's Genoa Bank account.

{¶ 56} After providing the foregoing testimony, Kinder began to identify the individual transactions that comprised the totals within each of the categories above. Shortly thereafter, the state indicated that the parties agreed to stipulate to the accuracy of the totals contained on Kinder's PowerPoint slide, thereby eliminating the need to have Kinder "go through additional accounts individually" and shortening the length of Kinder's remaining direct examination testimony. The trial court then confirmed the alleged agreement with appellant's trial counsel, and the parties subsequently prepared a joint exhibit memorializing the stipulation. The joint exhibit, which was admitted into the record at trial, reads as follows:

26.

STIPULATIONS. A stipulation is a voluntary agreement between the State and the Defendant concerning some relevant point. The parties have stipulated to the following facts:

1. The total amount of unaccounted for cash withdraws (sic) from all of the PHCA bank accounts by Harold Jason Craig is $51,636.53.

2. The total amount of PayPal debit card withdraws (sic) done by Harold Jason Craig is $7,438.

3. The total amount of commission checks from Visalus deposited into the C-Dude Investment Huntington National Bank Account (x8999) is $40,710.35.

4. The total amount of checks for EBay that was deposited into the C-Dude Investment Huntington National Bank Account (x8999) is $714.50.

5. The total amount of checks from PHCA deposited into the C-Dude Investment Huntington National Bank Account (x8999) is $36,454.

6. The total amount of commission checks from Visalus deposited into Kristie Koester's Genoa Bank Account (x7801) is $1,815.74.

7. The total amount of checks from PHCA deposited into Kristie Koester's Genoa Bank Account (x7801) is $6,721.66.

8. The total amount of funds that were deposited from PayPal to Bank Accounts other than PHCA is $63,974.01.

9. The total amount of funds removed from PHCA that [are] unaccounted for is $238,360.31.

{¶ 57} Following the parties' stipulation, the state questioned Kinder about PHCA's monthly meeting minutes. Kinder noted that the Ohio Attorney General's office did not receive the minutes for several monthly Board meetings. Nonetheless, Kinder reviewed the minutes that were provided. Upon his review of meeting minutes for Board meetings that took place after December 2012, when appellant opened a second bank account for PHCA at PNC Bank, Kinder noticed that the "numbers and the balances [contained in appellant's summaries of the balances in PHCA accounts] were not lining up with what the records were reflecting in the bank documents." For example, appellant reported to the Board that there was a total of $22,941.77 in PHCA's PNC general fund account according to the meeting minutes for the Board's May 2013 meeting. However, the PNC bank statement for that time period reflected a balance of only $6,071.03. These discrepancies led Kinder to conclude that appellant was not truthful in his communication of PHCA's finances to the Board.

{¶ 58} Kinder also recalled reviewing documents that memorialized discussions among Board members about the prospect of investing in real estate, although he indicated that the documents did not include a decision on that matter.

{¶ 59} On cross examination, Kinder clarified that his use of the term "unaccounted funds" described funds that he could not track or confirm after appellant withdrew them from PHCA accounts. He acknowledged that the term did not necessarily

28.

mean that something improper was done with funds after withdrawal. This caveat was reiterated by appellant's trial counsel during his closing arguments, in which he stated:

> And I'll leave you with something that I think is important. I think sometimes it gets lost. Unaccounted for means unaccounted for. It doesn't mean stolen. It doesn't mean laundered. It's that the records that they have, people just couldn't track it. And all we can do is apologize for the shoddy records. If we had better records that could have been accounted-for money, we may not be here.

{¶ 60} On redirect examination, Kinder testified that appellant's documentation of PHCA's financial affairs became unreliable once the PNC Bank account was opened and PHCA was using that account simultaneously with the Key Bank account. Specifically, Kinder stated:

> Basically the two different accounts are running at the same time. And there's no real documentation in any of the Quick Books as far as to what was going on. After a certain point in time after December of 2012 there's no real documentation as to what's happening in the Key Bank account ending in 1847 or the medical clinic account. To finish my explanation for you on your previous question of some of the things I'm seeing, you're seeing a lot of structuring between the different accounts trying to hide things.

29.

{¶ 61} At the conclusion of Kinder's testimony, the state rested its case-in-chief. Thereafter, appellant moved the trial court for an acquittal under Crim.R. 29. In articulating his argument in support of the motion, appellant's trial counsel focused on the charges of money laundering, contending that the state had not introduced sufficient evidence of appellant's concealment of assets. Further, counsel argued that the state had not demonstrated that PHCA's funds were "taken in an illegal means and put into a legitimate means." As to the charge of engaging in a pattern of corrupt activity, counsel asserted that the state's evidence "at most shows an individual act, not someone engaged in the enterprise of others."

{¶ 62} In response, the state argued that the elements of money laundering were established by the evidence establishing that appellant and Koester were using PHCA as their own for profit business. As evidence of concealment, the state pointed to the string of transactions that were used by appellant to make stolen funds look as if they were legally obtained. The state noted that the funds used to purchase the investment properties were first transferred from TCF into PHCA's accounts, then from PHCA's accounts to the C-Dude investment account, and finally used to purchase the investment properties from the Wood County Sheriff, culminating in the issuance of a sheriff's deed that would appear to legitimize appellant's ownership of the properties purchased with funds stolen from PHCA. Thereafter, appellant used the allegedly stolen real estate as income-generating investment properties.

30.

{¶ 63} As to the charge of engaging in a pattern of corrupt activity, the state argued that its evidence established that appellant was not acting alone in this case. As examples of those with whom appellant associated in furthering his corrupt activity (namely theft in this case according to the indictment), the state pointed to PHCA, Koester, and those whom appellant enlisted to help him with the ViSalus and penny fundraisers.

{¶ 64} Upon review, the trial court found that appellant's transfer of funds from PHCA's accounts into accounts over which he exercised control was sufficient to establish theft. Further, the trial court found that appellant's money laundering was established based upon he and Koester's purchase of the investment properties with stolen funds that appeared to belong to Koester because they had been previously deposited into her account. Further, the trial court summarily denied appellant's Crim.R. 29 motion with respect to the charge of engaging in a pattern of corrupt activity. Notably, the trial court did not separately address the aggravated theft charge as that offense was not argued by the parties in the context of the Crim.R. 29 motion.

{¶ 65} Following the trial court's denial of appellant's Crim.R. 29 motion, appellant took the stand as the sole witness during his case-in-chief. Early in his testimony, appellant explained that he joined the Board in the spring of 2012, and thereafter noticed that PHCA was generating no income despite significant expenses associated with employee salaries and janitorial costs. These expenses led appellant to suggest a variety of fundraising ideas, including the sale of ViSalus products.

31.

{¶ 66} Appellant began personally selling ViSalus products in early 2012, prior to joining the Board. During the course of his involvement with PHCA, he suggested selling ViSalus products to Stephanie "to earn some money for the center." According to appellant, multiple bank accounts were necessary for the ViSalus fundraiser because only $5,000 of product could be purchased per payment method.

{¶ 67} As to how the fundraiser was administered, appellant stated that ViSalus products were purchased by himself and other salespeople, and then sold at a narrow profit margin. The sales also generated commissions for the salespeople, who retained 25 percent of the commissions in order to allow them to pay their income tax obligations associated with the commissions. Appellant testified that the commission checks were deposited into non-PHCA accounts so that the funds could be used to purchase more product. On cross-examination, appellant acknowledged that not all the commissions went back to PHCA, and he admitted that the Board never approved the retention of any of the commissions generated by selling ViSalus products. In addition, appellant acknowledged that the Board did not approve of his transfer of funds from PHCA's Key Bank account to Koester's Genoa Bank account, allegedly for the purpose of purchasing more product.

{¶ 68} Regarding his recordkeeping practices as PHCA treasurer, appellant testified that he changed the preexisting practice of tracking the organization's finances with a Microsoft Excel spreadsheet, opting instead to use QuickBooks for such tracking. Appellant testified that he prepared summaries of PHCA's finances in anticipation of the

monthly Board meetings, which were then prepared by PHCA's secretary and eventually approved by the Board. When asked why his summary numbers did not always match up with PHCA's bank records, appellant stated, "I'm lazy," and explained that he "would put things in sometimes on the day they were done before deposits were even made." Appellant later acknowledged that there were accounting inaccuracies within PHCA's QuickBooks file because he "would get bored" and "wouldn't pay attention."

{¶ 69} Concerning his purchase of the investment properties at issue in this case, appellant testified that the properties were purchased for the benefit of PHCA. He testified that he initially discussed the possibility of PHCA investing in real estate with Stephanie, and then later brought the matter up to the Board during a meeting. According to appellant, "there was a vote, and an approval to request money from the Toledo Community Foundation to invest in real estate" in September 2012. Appellant went on to insist that investment in real estate was the purpose of the $34,000 that was withdrawn from the TCF endowment. When asked to explain why the properties were put in Koester's name, appellant stated that doing so was "not against policy, I guess, I mean it's not against the rules." Appellant testified that the Board discussed placing the property in PHCA's name, but he did not indicate the decision of the Board on that issue. Further, on cross-examination, appellant admitted that the Board never approved his transfer of PHCA funds into the C-Dude investment account prior to purchasing the investment properties and putting them in Koester's name.

33.

{¶ 70} At the conclusion of his testimony, appellant rested. He then renewed his Crim.R. 29 motion without additional argument. The trial court summarily denied the motion, and the state recalled Stephanie as its sole rebuttal witness. At this juncture, Stephanie testified that she was present at the Board meetings in which investment of PHCA funds into real estate was discussed with appellant. She indicated that the Board never discussed the idea of appellant purchasing real property on behalf of PHCA. Further, Stephanie testified that the Board was unaware of appellant's purchase of real property from the sheriff's sale in December 2012. Contrary to appellant's assertions, Stephanie testified that the $34,000 that was withdrawn from the TCF endowment fund was earmarked for operational needs, not real estate investment.

{¶ 71} After Stephanie's testimony was complete, the matter proceeded to closing arguments and jury instructions. Following deliberations, the jury returned with guilty verdicts on all five counts in the indictment. The matter was then continued for sentencing. On March 13, 2020, appellant filed a motion for new trial, which was subsequently denied following a hearing on March 31, 2020. That same day, the matter proceeded to sentencing.

{¶ 72} During the sentencing hearing, the trial court determined that the three money laundering counts were subject to merger as allied offenses of similar import. Additionally, the trial court found that the aggravated theft count merged with the charge of engaging in a pattern of corrupt activity. The state chose to proceed on counts one (engaging in a pattern of corrupt activity) and five (money laundering) of the indictment.

34.

Ultimately, the trial court imposed sentences of seven years and 36 months for counts one and five, respectively, and ordered the sentences to be served concurrently. Thereafter, appellant filed his timely notice of appeal.

## B. Assignments of Error

{¶ 73} On appeal, appellant assigns the following errors for our review:

I. The prosecution failed to present any evidence that a theft occurred at all, and as such failed to present sufficient evidence for a theft conviction as charged under the Ohio and United States Constitutions and the trial court erred in denying Mr. Craig's Rule 29 Motion at the close of the prosecution's case.

II. The prosecution failed to present sufficient evidence that the offense of money laundering as charged was committed in violation of the Ohio and United States Constitutions.

III. The prosecution failed to present sufficient evidence that the crime of engaging in a pattern of corrupt activity was committed.

IV. Mr. Craig was denied his right [to] counsel under the Ohio and United States Constitutions because the performance of defense counsel fell below a reasonable standard of competence and was so prejudicial that it rendered the verdict unworthy of confidence.

V. The trial court committed plain error by permitting a stipulation contrary to the defendant's testimony to be entered and in allowing the

35.

prosecution to engage in misconduct by eliciting testimony and making commentary in closing that was contrary to Ohio Statutes and/or conflated civil statutes with criminal offenses and commentary in closing based upon the prosecutor's personal opinion of Mr. Craig as a "scam artist" and similar commentary.

VI. The Appellant was denied due process and a fair trial pursuant to U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1 §10 as all of his convictions are against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented.

For ease of discussion, we will address appellant's sixth assignment of error prior to his fourth and fifth assignments of error.

## II. Analysis

### A. Sufficiency of the State's Evidence

{¶ 74} In appellant's first, second, and third assignments of error, he argues that his convictions were not supported by sufficient evidence.

{¶ 75} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668

(1997).  In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses.  *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

### i.  Aggravated Theft

{¶ 76} In his first assignment of error, appellant challenges the sufficiency of the state's evidence with respect to his conviction for aggravated theft in violation of R.C. 2913.02(A)(2) and (B)(2), which provides:

> (A)  No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> * * *
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
>
> * * *
>
> (B)(2) * * * If the value of the property or services stolen is one hundred fifty thousand dollars or more and is less than seven hundred fifty thousand dollars, a violation of this section is aggravated theft, a felony of the third degree.

{¶ 77} Here, the state charged appellant with aggravated theft based upon his gradual routing of PHCA funds totaling $238,360.31 from PHCA accounts to accounts over which he exercised control from August 1, 2012, to December 31, 2015, while

37.

acting as PHCA's treasurer. In his brief, appellant does not challenge the state's evidence establishing the dollar amount of such transfers, nor does he contest that such transfers actually took place. Rather, appellant asserts that he was vested with the authority to administer the finances of PHCA as its treasurer during this time period, claims he acted within such authority, and argues that the state's evidence was insufficient to establish that he intended to deprive PHCA of its property or exceeded PHCA's express or implied consent when he transferred and used PHCA funds. According to appellant, the state introduced no evidence whatsoever as to the scope of authority he enjoyed as PHCA's treasurer. Appellant goes on to characterize his actions as treasurer of PHCA as "open, notorious, and ongoing."

{¶ 78} In response, the state argues that it did, in fact, introduce evidence bearing upon the express or implied scope of authority given to appellant by PHCA. Specifically, the state points to evidence, including acknowledgements from appellant himself, that PHCA did not approve of appellant's use of PHCA funds to purchase the investment properties that appellant titled in Koester's name, and later lost to foreclosure.

{¶ 79} "Ostensibly, the purpose of R.C. 2913.02(A)(2) was to codify common law embezzlement in the theft statute." *State v. Dortch*, 2d Dist. Montgomery No. 17700, 1999 WL 819569, *4 (Oct. 15, 1999); *see also State v. Metheney*, 87 Ohio App.3d 562, 566, 622 N.E.2d 730 (9th Dist.1993), citing Committee Comment to R.C. 2913.02 (stating that R.C. 2913.02(A)(2) "was meant to cover cases of embezzlement, where a person with lawful possession of property exerts control over that property so as to

38.

deprive the owner of the same"). As to the scope of consent element of R.C.

2913.02(A)(2), the court in *Dortch* explained: "If the individual begins to use the

property for something outside what the owner specifically authorized, the individual has

gone beyond the owner's consent." *Id*.

{¶ 80} At the outset, we acknowledge that none of the state's trial witnesses

expressly articulated the precise limits of consent granted to appellant from PHCA.[6]

Thus, such limits, if they can be ascertained at all, must be gleaned from the

circumstantial evidence pertaining to PHCA's scope of consent and the inferences

reasonably drawn therefrom. As an aid to this analysis, we will examine the facts that

have been relied upon by other courts to support the scope of consent element of R.C.

2913.02(A)(2).

{¶ 81} A review of the case law addressing the scope of consent element reveals

that the state may prove that element using various pieces of evidence. For example, in

*State v. Dobbins*, 4th Dist. Washington No. 11CA6, 2011-Ohio-6777, ¶ 15, the Fourth

District determined that a bookkeeper acted beyond the scope of her employer's consent

---

[6] At oral argument in this case, the state referenced PHCA's articles of incorporation and indicated that the scope of the treasurer's authority is set forth therein. However, our review of the record confirms that the state failed to introduce the articles of incorporation at trial, and no testimony regarding the contents of that document was provided by any of the state's witnesses. Therefore, we may not consider PHCA's articles of incorporation. *See City of Fairborn v. Hoffman*, 2d Dist. Greene No. 84-CA-71, 1985 WL 8734, *1 (July 2, 1985) ("It requires no recitation of authority that this court may not consider evidence dehors the record.").

39.

when she made a check payable to herself "without any company-related justification and signed it."

{¶ 82} More recently, the Fourth District held that a defendant's conviction for theft under R.C. 2913.02(A)(2) was not against the manifest weight of the evidence, where the defendant acknowledged that funds withdrawn from her mother's bank account belonged to her mother and were for her use, and the mother testified that she never authorized the defendant to put her money into the defendant's personal account or spend her money without her permission. *State v. Woodburn*, 2019-Ohio-2757, 140 N.E.3d 66, ¶ 25 (4th Dist.).

{¶ 83} Additionally, in *State v. Allgeyer*, 2018-Ohio-1893, 112 N.E.3d 27 (12th Dist.), the Twelfth District rejected a sufficiency argument raised by Nicole Allgeyer, a former director of a cheerleading organization who was convicted of grand theft in violation of R.C. 2913.02(A)(2). On appeal, Allgeyer argued that the informal practices of the organization and its lack of written rules regarding handling of organization funds precluded a finding that she exceeded the organization's express or implied consent when she used the organization's bank card to make personal purchases and ATM cash withdrawals.

{¶ 84} At trial in *Allgeyer*, the state introduced evidence from the cheer organization's treasurers, who testified that the organization had no written policies, bylaws, or rules, but that "it was 'clear' that the bank card and funds were to be used solely for the organization and the benefit of the cheerleaders." *Id.* at ¶ 21. Further, one

40.

of the treasurers stated that the director's responsibilities included purchasing uniforms and supplies in conjunction with the organization's fundraising events, and then providing receipts for such purchases. In light of Allgeyer's role as director of the organization, the court found that jurors could reasonably conclude that Allgeyer was aware of the organization's procedures when she refused to provide documentation of her purchases. The court went on to find that Allgeyer's refusal to provide receipts on demand was evidence that "she subjectively knew that her use of the bank card to purchase meals, gas, alcohol, livestock supplies, and a tanning session was improper." *Id.* at ¶ 31. Consequently, the court found that the state's evidence was sufficient to support the theft conviction under R.C. 2913.02(A)(2).

{¶ 85} In *State v. Seeds*, 7th Dist. Mahoning No. 16 MA 0055, 2017-Ohio-9069, the Seventh District examined the scope of consent element of R.C. 2913.02(A)(2) in the context of a sufficiency and manifest weight argument raised by a defendant, Annette Seeds, who was a former president, treasurer, and secretary of a local parent teacher association ("PTA").

{¶ 86} During trial, the state introduced evidence including bank statements showing that she withdrew several thousand dollars in cash from the PTA's bank account, and used organization funds to purchase fuel and pay for meals at restaurants. *Id.* at ¶ 3. The evidence included testimony from two former PTA treasurers who served while Seeds was president, revealing that Seeds refused to provide financial records upon demand or add them as PTA's bank account. *Id.* at ¶ 4. Several witnesses also testified

41.

that the board does not reimburse for fuel purchases or permit ATM withdrawals. *Id.* at ¶ 10. One of the state's witnesses, a former PTA vice president, testified that Seeds told her that she was using the PTA debit card for fuel purchases, but noted that the issue was never discussed with the board. *Id.* at ¶ 22. Moreover, another witness testified that "there was a formal process to follow" for someone seeking reimbursement from the PTA. *Id.* at ¶ 24.

{¶ 87} Notwithstanding this evidence, Seeds argued on appeal that she was authorized to make the contested expenditures as the PTA's president and treasurer. *Id.* at ¶ 9. Further, Seeds asserted that the PTA's board was authorized to consent to such expenditures. *Id.* Citing multiple board members who testified that they approved of the expenditures, and noting that she prepared treasurer's reports reflecting the expenditures and received no objection from the board, appellant contended that "there is no evidence that any specific transaction was unauthorized." *Id.* However, one of the state's witnesses, who was president of the PTA while Seeds was treasurer, testified that appellant's treasurer's reports did not include Seeds' ATM withdrawals and fuel purchases. *Id.* at ¶ 16.

{¶ 88} The Seventh District reviewed the foregoing evidence in its examination of Seeds' sufficiency argument. In doing so, the Seventh District cited the state's evidence revealing that a formal process was in place for the reimbursement of expenses, which included the submission of a receipt for board authorization of the reimbursement. *Id.* at ¶ 28. Because Seeds never secured the board's authorization, the Seventh District

42.

concluded that Seeds' expenditures exceeded the scope of the consent of the board, and thus rejected Seeds' argument that her conviction for grand theft under R.C. 2913.02(A)(2) was not supported by sufficient evidence and was against the manifest weight of the evidence. *Id.* at ¶ 29.

{¶ 89} In light of the foregoing case law, we find that a variety of evidence may be used by the state to prove that a defendant acted beyond the scope of the express or implied consent of the owner of property over which the defendant obtained or exerted control. This evidence includes, without limitation: (1) the defendant's writing and endorsing of checks payable to the defendant from the owner's bank account without justification, as in *Dobbins*; (2) the defendant's unauthorized withdrawal of funds from the owner's bank account and subsequent personal use of such funds without the owner's permission, as in *Woodburn*; (3) the defendant's personal use of organization funds and subsequent refusal to provide documentation of such personal use in violation of informal policies, as in *Allgeyer*; and (4) the defendant's failure to comply with formal organizational processes prior to withdrawal of organization funds used as reimbursement for the defendant's personal expenses, as in *Seeds*.

{¶ 90} Like the evidence introduced in the foregoing cases, the state presented evidence in this case to establish that appellant's exercise of control of PHCA's funds exceeded the scope of PHCA's express or implied consent. The state's evidence reveals that appellant used the funds that were held in PHCA accounts for his personal benefit when they were intended to be used exclusively for PHCA's benefit.

43.

{¶ 91} As the treasurer, appellant was tasked with paying bills, making necessary purchases, and preparing a monthly treasurer's report. During the course of the trial, the state introduced evidence to show that appellant went far beyond this narrow scope of authority by transferring and withdrawing funds from PHCA accounts into accounts over which he exercised control, and then using those funds for his personal benefit. We have previously held that evidence of such personal use of organizational funds constitutes sufficient evidence to support a charge of theft under R.C. 2913.02(A)(2). *See State v. Eppard*, 6th Dist. Lucas No. CL 05-1279, 2007-Ohio-2257, ¶ 14 ("In our view, the jury reasonably could have found Eppard guilty of grand theft based on her act of writing checks * * * and having the proceeds of those checks placed in her own bank account.").

{¶ 92} Despite PHCA's preexisting policy requiring Board approval prior to the making of any major purchases (as stated by Rodriguez),[7] appellant unilaterally transferred PHCA funds into the C-Dude Investment account and used those funds to purchase the investment properties he acquired in December 2012. Stephanie testified that the Board discussed, but did not approve of, appellant's idea to invest in real estate. On cross examination, appellant acknowledged that he did not receive Board approval prior to purchasing the investment properties. Further, the investment properties

---

[7] This policy was set forth by Rodriguez, who preceded appellant as PHCA treasurer. None of the other witnesses, including appellant, testified that the Board changed this policy after Rodriguez resigned.

44.

appellant purchased using PHCA funds were never a benefit to PHCA, because they were held in Koester's name until such time as they were lost to foreclosure.

{¶ 93} In addition to the unauthorized use of PHCA funds for the purchase of the investment properties, appellant used PHCA funds to purchase ViSalus products without Board authorization. These products were then sold, generating a small profit plus a sales commission. Stephanie testified, and appellant agreed, that these profits and commissions were intended to be used for PHCA's benefit. However, appellant deposited the proceeds into Koester's bank accounts, and Kinder was unable to trace the funds back into PHCA accounts thereafter. While appellant was withdrawing cash and transferring funds from PHCA's bank accounts into Koester's accounts for his personal use, he failed to account for such transactions in his treasurer reports to the Board. Further, no evidence was introduced by appellant to refute the notion that he deposited the proceeds into Koester's bank accounts rather than PHCA accounts.

{¶ 94} On cross-examination, appellant admitted that the Board never approved of his retention of the commissions generated by selling ViSalus products. Moreover, the state introduced photocopies of these ViSalus commission checks, one of which included a forged signature and an endorsement from Stephanie to C-Dude Investments. Stephanie testified that she signed over several other ViSalus commission checks to appellant with the understanding that he would deposit them into PHCA's account for use by the organization, not for appellant's personal use.

45.

**{¶ 95}** In sum, the foregoing evidence, when viewed in a light most favorable to the state, demonstrates that appellant routed PHCA funds totaling over $200,000 into the C-Dude investment account and Koester's personal bank accounts for his personal use, without prior approval of the Board and in a manner indicative of his awareness that he was not entitled to do so. Consistent with the case law articulated above, we find that this evidence is sufficient to establish that appellant purposefully deprived PHCA of its property and exerted control over the property in such a manner as to exceed the scope of PHCA's express or implied consent. Accordingly, we find that appellant's conviction for aggravated theft under R.C. 2913.02(A)(2) was supported by sufficient evidence, and his first assignment of error is not well-taken.

### ii. Money Laundering

**{¶ 96}** In his second assignment of error, appellant challenges the sufficiency of the state's evidence with respect to his convictions for money laundering in violation of R.C. 1315.55(A)(3), which provides: "No person shall conduct or attempt to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity." The term "corrupt activity" is defined in R.C. 2923.31(I), and includes theft in violation of R.C. 2913.02. *See State v. Searfoss*, 2019-Ohio-4619, 135 N.E.3d 853, ¶ 78 (6th Dist.), citing R.C. 1315.51(B) and 2923.31(I)(2)(c).

**{¶ 97}** In this case, appellant was convicted of three counts of money laundering relating to his purchase of real property in late 2012. The "corrupt activity" alleged in

46.

this case related to thefts committed by appellant over the course of three transactions, including appellant's October 11, 2012 payment of $3,000 to the Wood County Sheriff's Department as a deposit toward the purchase of the real property, his December 19, 2012 withdrawal of $25,000 from PHCA's Key Bank medical clinic account and subsequent deposit into an investment account owned by Koester, and his December 20, 2012 payment of $13,000 to the Wood County Sheriff's Department to pay for the remaining balance on the real property.

{¶ 98} Appellant's sufficiency argument regarding the foregoing money laundering counts is two-fold. First, appellant contends that the state failed to introduce evidence to prove that he committed any thefts. In our resolution of appellant's first assignment of error, we rejected this argument and found that the state's evidence concerning appellant's use of PHCA funds to purchase the investment properties from the Wood County Sheriff's Department was sufficient to establish aggravated theft in violation of R.C. 2913.02(A)(2). Therefore, we need not revisit this argument.

{¶ 99} Second, appellant argues that the state failed to introduce sufficient evidence to prove that he conducted the transactions culminating in the purchase of the investment properties with the purpose to promote, manage, establish, or carry on corrupt activity. Relying upon our decision in *Searfoss*, *supra*, and the cases cited therein, appellant asserts that "the State improperly sought to turn Ohio's money laundering statute into a 'money-spending' statute because the State thought Mr. Craig's expenditures on behalf of PHCA seemed odd or curious."

47.

{¶ 100} In response, the state argues that this case is distinguishable from *Searfoss* insofar as the defendant in that case merely used the proceeds of his thefts to purchase real estate for his *personal* use, whereas appellant used stolen funds to purchase investment properties in an attempt to generate further income that would appear to be lawfully obtained.

{¶ 101} In *Searfoss*, we addressed a sufficiency argument raised by a defendant, Robert Searfoss, who was convicted on several counts of money laundering, two of which fell under R.C. 1315.55(A)(3), the same statutory section at issue in the present case. In challenging the sufficiency of the evidence as to those two counts on appeal, Searfoss argued that his purchase of a single family residence for his family with stolen funds did not promote further theft in any way, and thus did not support the promotion element of the money laundering statute. *Searfoss*, 2019-Ohio-4619, 135 N.E.3d 853, at ¶ 79.

{¶ 102} Relying upon precedent from federal courts construing the promotion element of the federal money laundering statute, 18 U.S.C. 1956(a)(1)(A)(i), we agreed with Searfoss and found that there was "no support for the state's suggestion that [Searfoss] purchased the Perrysburg residence with the purpose to promote corrupt activity." *Id.* at ¶ 84. We went on to find that Searfoss's purchase of the residence occurred *after* the theft offense was already completed, and thus did not promote ongoing theft. *Id.* We found that the money laundering charge was "based merely upon appellant's expenditure of the stolen Trust funds," and noted that "'[t]he act of

48.

transacting money alone does not amount to money laundering.'" *Id*. at ¶ 85, quoting *State v. Pugh*, 9th Dist. Summit No. 24905, 2010-Ohio-2741, ¶ 13.

{¶ 103} Having set forth the salient points from our decision in *Searfoss*, we now turn to the application of those points to the case sub judice. Like *Searfoss*, this case involves theft-related charges of money laundering under R.C. 1315.55(A)(3). For its part, the state invites us to rely upon the difference in the type of real estate purchased – a family residence in *Searfoss* versus investment properties used to generate further income in this case – as a reason for distinguishing *Searfoss* and finding that its evidence was sufficient to establish the promotion element of R.C. 1315.55(A)(3). We have considered the state's argument, but find it unavailing.

{¶ 104} In *Searfoss*, we did not rely upon, or even draw, a distinction between real estate used as a family dwelling and real estate used as investment property. Instead, we focused on the distinction between real estate used for legitimate, lawful means (i.e. as a family dwelling) and real estate used to further the corrupt activity (i.e. theft). *Id*. at ¶ 85. Prosecution in the former case amounts to "'turning the money laundering statute into a money spending statute.'" *Id.* at ¶ 86, quoting *United States v. Brown*, 186 F.3d 661, 670 (5th Cir.1999).

{¶ 105} Similar to *Searfoss*, this case involves the purchase of real estate with previously stolen funds, and subsequent use of that real estate for lawful ends, namely the generation of rental income. The state has not established, or even alleged, that the rental income generated from the transactions at issue here was somehow used by appellant to

49.

further pilfer money from PHCA or carry on appellant's corrupt activity, nor has the state introduced any evidence to prove that appellant intended to use the real estate to promote further unlawful activity. Therefore, the state has not met its burden with respect to the promotion element of R.C. 1315.55(A)(3). *See United States v. Olaniyi-Oke*, 199 F.3d 767 (5th Cir.1999) (overturning a federal money laundering conviction, where the government introduced no evidence to demonstrate that the defendant intended to use computers purchased with stolen funds to promote further unlawful activity).

{¶ 106} In short, the state's evidence is insufficient to support the money laundering counts in this case for the same reason it failed in *Searfoss*: appellant cannot be convicted for money laundering under R.C. 1315.55(A)(3) for simply spending stolen funds to purchase real property for his own use, where such use does not "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity." R.C. 1315.55(A)(3). Accordingly, appellant's second assignment of error is well-taken, and his convictions for money laundering must be vacated.

### iii. Engaging in a Pattern of Corrupt Activity

{¶ 107} In his third assignment of error, appellant challenges the sufficiency of the state's evidence with respect to his conviction for engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) and (B)(1), which provides, in relevant part:

> (A)(1) No person employed by, or associated with, any enterprise
>
> shall conduct or participate in, directly or indirectly, the affairs of the

50.

enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

(B)(1) Whoever violates this section is guilty of engaging in a pattern of corrupt activity. * * * Except as otherwise provided in this division, if at least one of the incidents of corrupt activity is a felony of the first, second, or third degree, aggravated murder, or murder, * * * engaging in a pattern of corrupt activity is a felony of the first degree.

{¶ 108} Here, appellant was convicted of one count of engaging in a pattern of corrupt activity. The "corrupt activity" alleged by the state included, among other things, multiple thefts under R.C. 2913.02. As already noted, the term "corrupt activity" is defined in R.C. 2923.31(I), and includes theft in violation of R.C. 2913.02. 2923.31(I)(2)(c).

{¶ 109} In challenging the sufficiency of the state's evidence concerning the charge of engaging in a pattern of corrupt activity, appellant contends that the state failed to introduce any evidence to establish (1) the existence of any corrupt activity, and alternatively (2) that more than one incident of corrupt activity occurred.

{¶ 110} In support of his first argument, appellant refers to the seven incidents of theft-related corrupt activity contained in the indictment and argues that the state failed to introduce sufficient evidence to establish those theft offenses for the reasons articulated in his first assignment of error. We have already found that the state's evidence was sufficient to support appellant's conviction for aggravated theft in our resolution of

51.

appellant's first assignment of error. Therefore, we reject appellant's contention that the state failed to introduce evidence to establish the existence of any corrupt activity.

{¶ 111} Next, we turn to appellant's assertion that the record contains no evidence to establish more than one incident of corrupt activity. In his brief, appellant asserts, without elaboration, that the individual incidents of theft making up the charge of engaging in a pattern of corrupt activity in the indictment "combine to form one incident." In essence, appellant's argument attacks the sufficiency of the state's evidence on the pattern element of R.C. 2923.32(A)(1).[8]

{¶ 112} R.C. 2923.31(E) defines "pattern of corrupt activity" as "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶ 113} In the indictment, the state lists several incidents of theft that occurred over a three-year period from August 1, 2012, to December 31, 2015. In total, the state alleged that appellant, acting in association with Koester, stole $238,360.31 from PHCA while he was treasurer of the organization. During the five-day jury trial in this matter, the state introduced extensive evidence to support its allegations of the individual incidents of theft set forth in the indictment.

---

[8] Appellant does not raise a sufficiency argument regarding the enterprise element under R.C. 2923.32(A)(1), which the state established by showing that appellant committed his theft offenses in association with Koester.

{¶ 114} Specifically, the state introduced testimony from Kinder, who tracked the flow of money into and out of PHCA's accounts and Koester's accounts over the relevant time period, and determined that a total of $238,360.31 in unaccounted funds were missing from PHCA's accounts. During his testimony, Kinder tracked individual transfers and withdrawals made by appellant from PHCA accounts, and was careful to exclude from his total calculation any transactions that he could not identify as illegitimate. Further, the state's trial witnesses testified to appellant's unauthorized withdrawal of funds out of PHCA's bank accounts on multiple occasions, and his subsequent use of those funds to purchase real estate that was held by Koester in her name. The state's evidence also demonstrates that appellant used PHCA funds to purchase ViSalus products without Board authorization, and then deposited the proceeds from the sales of those products into Koester's accounts. Once removed, the funds were never redeposited into PHCA's accounts.

{¶ 115} Upon our consideration of the entire record in this case, we find that the foregoing evidence, when viewed in a light most favorable to the state, established that appellant committed multiple theft offenses over a span of several years and utilized more than one scheme to do so. We find that this evidence demonstrates that appellant's theft offenses were not isolated, and were not so closely related to each other and connected in time and place that they constitute a single event. Thus, we reject appellant's argument that these thefts combine to form one incident of corrupt activity.

{¶ 116} Accordingly, appellant's conviction for engaging in a pattern of corrupt activity was supported by sufficient evidence, and his third assignment of error is not well-taken.

### B. Manifest Weight of the Evidence

{¶ 117} In his sixth assignment of error, appellant argues his convictions were against the manifest weight of the evidence.

{¶ 118} When evaluating a manifest weight claim, we review the entire record as a "thirteenth juror," weighing the evidence and all reasonable inferences to be drawn therefrom, and considering the credibility of witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 119} Sufficiency of the evidence "examines whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Crawford*, 6th Dist. Lucas No. L-17-1296, 2019-Ohio-3123, ¶ 46, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. By comparison, "the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶ 120} Here, we have already found that appellant's money laundering convictions were not supported by sufficient evidence. Thus, appellant's manifest weight

54.

argument is moot as to those offenses. Concerning his convictions for aggravated theft and engaging in a pattern of corrupt activity, we find that the state's evidence supports the jury's verdict. The evidence introduced by the state at trial shows that appellant systematically embezzled over $200,000 from PHCA over a three-year time period. Appellant accomplished this by withdrawing PHCA funds and then using them for his benefit and the benefit of Koester, in excess of the authority given to him as PHCA treasurer.

{¶ 121} Notably, much of the state's evidence was uncontested by appellant, who acknowledged that he was never authorized transfer PHCA funds into the C-Dude investment account or purchase real estate on behalf of PHCA. Moreover, appellant admitted that the ViSalus fundraiser was for PHCA's exclusive benefit, and acknowledged that PHCA did not authorize him to retain the commissions generated from the sale of ViSalus products purchased using PHCA funds.

{¶ 122} Given the evidence in the record, we do not find that this is the exceptional case in which the evidence weighs heavily against appellant's convictions for aggravated theft and engaging in a pattern of corrupt activity. Accordingly, we find appellant's sixth assignment of error not well-taken.

### C. Ineffective Assistance of Counsel

{¶ 123} In appellant's fourth assignment of error, he argues that he was deprived of his right to effective assistance of trial counsel.

55.

{¶ 124} To demonstrate ineffective assistance of counsel, appellant must first show that trial counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because "effective assistance" may involve different approaches or strategies, our scrutiny of trial counsel's performance "must be highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. Should appellant demonstrate her trial counsel's performance was defective, appellant must also demonstrate that prejudice resulted. *Bradley* at paragraph two of the syllabus.

{¶ 125} In support of his ineffective assistance argument, appellant contends that his trial counsel should not have agreed to the joint stipulation in which the parties agreed that various funds were "unaccounted for" as indicated by Kinder during his testimony. According to appellant, the characterization of these funds as "unaccounted for" was contrary to his testimony, during which he attempted to explain how the funds at issue were used after they were removed from PHCA's accounts. Given this conflict, appellant insists that his trial counsel should not have agreed to the joint stipulation. Further, appellant argues that his trial counsel was ineffective for failure to adequately investigate his case or secure exculpatory witnesses on his behalf.

{¶ 126} In response, the state argues that the decisions to enter into a stipulation and to call or not call a particular witness are strategic, and thus do not give rise to a

56.

claim of ineffective assistance of counsel. In support, the state cites the Ohio Supreme Court's decision in *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31.

{¶ 127} In *Davis*, the court reviewed an ineffective assistance argument premised upon trial counsel's decision to enter into ten joint stipulations, which the defendant argued was suggestive of his agreement with the state's theory of the case. *Id.* at ¶ 346. In reviewing that argument, the Ohio Supreme Court noted that trial counsel's decision to enter into the stipulations was a reasonable tactical decision. *Id.* at ¶ 347, citing *State v. Green*, 66 Ohio St.3d 141, 148, 609 N.E.2d 1253 (1993). The court went on to reject the defendant's ineffective assistance argument, finding that "[n]othing in the record suggests that any of the stipulated testimony would have been different had the witnesses been called to the stand. Trial counsel's stipulations allowed the defense to portray an air of candor before the jury. They also prevented a stream of additional prosecution witnesses from testifying in court." *Id.*

{¶ 128} Likewise, our review of the record in this case reveals trial counsel's deliberate decision to enter the joint stipulation as a matter of strategy. Specifically, trial counsel agreed to enter the stipulation in order to expedite Kinder's testimony and eliminate the need for Kinder to address each account individually. Notably, appellant acknowledges the strategic nature of the stipulation, indicating that "there might have been some basis for stipulation to the effect that the transaction in question took place, as that was not disputed, and might have saved the jury days of droning testimony about those transactions." Further, appellant recognizes that the stipulation was useful in

57.

"bypassing days of pointless, irrelevant and prejudicial testimony" that would have been introduced by the state without the stipulation. Ultimately, the stipulation entered into by trial counsel in this case, similar to that at issue in *Davis*, simply expedited the presentation of evidence. There is nothing in the record to suggest that the facts articulated in the joint stipulation are different from those that would have been provided by Kinder without the stipulation.

{¶ 129} Going beyond the admission of the stipulation itself, appellant also complains of the parties' use of the term "unaccounted for" in the stipulation, arguing that the term implied an acknowledgement of criminal activity on the part of appellant. However, we find no ineffective assistance on the part of trial counsel on this basis, because the precise meaning of this term was explored by trial counsel during Kinder's cross-examination. Indeed, Kinder acknowledged that the term did not necessarily mean that appellant utilized the funds in an improper way. The innocuousness of the term was then emphasized by trial counsel during closing arguments. Given trial counsel's handling of the term "unaccounted for," we find no support for appellant's suggestion that the term implied criminality on his part, and we conclude that appellant was not prejudiced by the inclusion of this term in the joint stipulation.

{¶ 130} Turning to appellant's contention that his trial counsel failed to adequately investigate his case or secure exculpatory witnesses on his behalf, we find that appellant has not demonstrated that trial counsel's performance in this regard fell below an objective standard of reasonableness or altered the outcome of the proceedings. While

58.

appellant identifies the name of one additional exculpatory witness whom he believes should have been called at trial, he fails to specify how the testimony elicited from that witness would have changed the result of the trial. Moreover, appellant does not specify what manner of further investigation his trial counsel should have undertaken, and how the failure to conduct that additional inquiry prejudiced him. Of course, "'[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.'" *State v. Murphy*, 91 Ohio St.3d 516, 542, 747 N.E.2d 765, quoting *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir.1993). Therefore, we reject appellant's contention that he received ineffective assistance of trial counsel on the basis of inadequate pretrial investigation or failure to call necessary exculpatory witnesses.

{¶ 131} In light of the foregoing, we find that appellant has not established that he received ineffective assistance of trial counsel. Accordingly, appellant's fourth assignment of error is not well-taken.

### D. Admission of Joint Stipulation and Prosecutorial Misconduct

{¶ 132} In his fifth assignment of error, appellant reiterates the argument he raised in his fourth assignment of error regarding the joint stipulation. Having already rejected that argument, we need not readdress it here. Additionally, appellant argues that the prosecutor committed misconduct at trial by eliciting improper testimony and making inflammatory comments during closing arguments, including calling appellant a "scam artist."

59.

{¶ 133} When reviewing a claim of prosecutorial misconduct, the relevant questions are (1) whether the prosecutor's remarks were actually improper, and (2) if they were improper, whether any of defendant's substantial rights were adversely affected by the remarks. *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). "Reversal is warranted only if the prosecutorial misconduct 'permeates the entire atmosphere of the trial.'" *State v. Beebe*, 172 Ohio App.3d 512, 2007-Ohio-3746, 875 N.E.2d 985, ¶ 8 (4th Dist.), quoting *United States v. Warner*, 955 F.2d 441, 456 (6th Cir.1992). Thus, we will not reverse unless the prosecutor's misconduct deprives the defendant of a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

{¶ 134} In this case, appellant's trial counsel did not object to the challenged testimony or the prosecutor's statements at closing. Therefore, any claim of prosecutorial misconduct is waived, absent plain error. *Searfoss*, *supra*, 2019-Ohio-4619, 135 N.E.3d 853, at ¶ 141, citing *State v. Smith*, 3d Dist. Hardin No. 6-14-14, 2015-Ohio-2977, ¶ 63. Under Crim.R. 52(B), plain error is limited to those errors or defects that affect substantial rights. Consequently, we may reverse for plain error only if it is clear that appellant would not have been convicted in the absence of the allegedly improper conduct. *Id.*, citing *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997).

{¶ 135} In support of his fifth assignment of error, appellant makes two prosecutorial misconduct arguments. First, appellant argues that the prosecutor committed misconduct at trial by eliciting testimony about appellant's potential violation of inapplicable "sunshine laws" and ethical rules governing public employees. While

60.

claiming that this line of questioning was improper, appellant does not explain how such testimony deprived him of a fair trial. It is clear from our review of the record that the allegedly improper evidence was isolated and did not permeate the trial. Moreover, when viewed in light of the state's remaining incriminating evidence, which was extensive, we find that appellant would have been convicted even in the absence of any mention of "sunshine laws" and ethical violations. Thus, we find no plain error based upon the prosecutor's elicitation of this evidence.

{¶ 136} Second, appellant argues that the prosecutor committed misconduct during closing arguments by stating that PHCA assets held by TCF were not PHCA's assets, and by calling appellant a "scam artist."

{¶ 137} "The prosecution is normally entitled to a certain degree of latitude in its concluding remarks. * * * It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." *State v. Smith*, 14 Ohio St.3d 13, 13-14, 470 N.E.2d 883 (1984), citing *State v. Woodards*, 6 Ohio St.2d 14, 26, 215 N.E.2d 568 (1966), *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982), and *United States v. Dorr*, 636 F.2d 117 (5th Cir.1981). "[T]he prosecution must avoid insinuations and assertions which are calculated to mislead the jury. It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *Id.* at 14 (internal citations omitted), quoting the Code of Professional Responsibility. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper

61.

and, if so, whether they prejudicially affected substantial rights of the defendant." *Id.* (citation omitted).

{¶ 138} As with his first argument, appellant fails to articulate how he was prejudiced by the prosecutor's statements during closing argument. Having reviewed the closing arguments in their totality, we find no prejudice in the prosecutor's distinction between PHCA funds and TCF funds. Indeed, the state charged appellant with theft and engaging in a pattern of corrupt activity based, in part, upon appellant's unauthorized withdrawal of the funds and subsequent deposit of said funds into Koester's account. Whether the funds were actually owned by TCF or merely held in escrow by TCF for the benefit of PHCA is immaterial. In either case, appellant's withdrawal of the funds exceeded the express or implied consent of the owner of the funds, and thus the elements of aggravated theft were proven.

{¶ 139} In addition, we find no impropriety in the prosecutor's use of the term "scam artist" to describe appellant. The prosecutor used that term while describing appellant's involvement in the ViSalus fundraiser. The prosecutor made the point, supported by the state's evidence, that appellant "scammed" ViSalus by misrepresenting that PHCA was selling the products for its benefit, when in fact the proceeds of the sales never went back to PHCA. As a nonprofit, PHCA was entitled to purchase the products at a reduced cost, which enabled appellant to maximize his profit on the subsequent sale of the products.

62.

{¶ 140} In a case involving a similar argument, the Seventh District reviewed the propriety of the prosecutor's statement, made during closing arguments, that "'this defendant is not a victim. This defendant, Rick Houseman, is a con; he's a fraud; he's a scam artist. He's not naive.'" *State v. Houseman*, 7th Dist. Belmont No. 98 BA 4, 2000 WL 875336, *3 (June 29, 2000). The court in *Houseman* found that characterizing Houseman as a con, fraud, and scam artist was "marginally permissible and not so prejudicial that appellant's trial was unfair." *Id.*, citing *State v. Clemons*, 82 Ohio St.3d 438, 452, 696 N.E.2d 1009 (1998); *see also State v. Green*, 67 Ohio App.3d 72, 80, 585 N.E.2d 990 (8th Dist.1990) (rejecting prosecutorial misconduct argument based upon a prosecutor's unchallenged closing argument that described the defendant as a fraud, a phony and a liar). In so finding, the court noted that the offenses with which appellant was charged, engaging in a pattern of corrupt activity and theft, "all involved fraud and deception." *Id.*

{¶ 141} Like the courts in *Houseman* and *Green*, we find that the state's isolated description of appellant as a "scam artist" during closing arguments in this case was not improper and did not deprive appellant of a fair trial. The prosecutor's comment was based upon trial evidence that was before the jury, and it did not fall outside the latitude normally afforded a prosecutor in closing arguments. Further, in light of the state's evidence, we find that the comment did not alter the outcome of the proceedings. Therefore, we find no merit to appellant's prosecutorial misconduct argument.

63.

{¶ 142} Having rejected appellant's arguments as to the trial court's admission of the parties' joint stipulation and his claims of prosecutorial misconduct, we find appellant's fifth assignment of error not well-taken.

### III. Conclusion

{¶ 143} Because we find that appellant's money laundering convictions were not supported by sufficient evidence, we reverse the judgment of the Wood County Court of Common Pleas as to those convictions and vacate said convictions. In all other respects, we affirm the judgment of the Wood County Court of Common Pleas. The state is hereby ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part, and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Gene A. Zmuda, P.J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.